John K. McKINLEY, Plaintiff,

v.

Justus C. MARTIN, Jr., and W. Grant Gregory, Defendants.

No. C89–1015J.

United States District Court, D. Wyoming.

Oct. 2, 1989.

Houston G. Williams, Casper, Wyo., for plaintiff.

Robert Jerry Hand, Casper, Wyo., Morris, Manning & Martin, Atlanta, Ga., for defendants.

## ORDER RULING ON MOTIONS TO TRANSFER AND TO STAY PENDING ARBITRATION

ALAN B. JOHNSON, District Judge.

The plaintiff John K. McKinley is the owner of certain real estate known as the Steerhead Ranch. It is located in Johnson County, Wyoming, in a relatively scenic area near the Big Horn Mountains. He filed this action to quiet title to this property, alleging that the defendants, Justus C. Martin, Jr., and W. Grant Gregory, are asserting claims against the ranch. In a counterclaim, Martin and Gregory seek to impose upon the ranch for their benefit a constructive trust. They allege the plaintiff acquired the ranch in breach of a fiduciary duty, which he owed to these defendants based on a joint venture that allegedly existed among the parties.

The record indicates McKinley had a discussion with Martin in January 1987 regarding the possibility of purchasing the Steerhead Ranch. This discussion evidently occurred while McKinley was visiting Martin at this home in Georgia, where Martin showed McKinley several real estate brochures, including one for the Steerhead Ranch. Sometime later, Gregory also visited Martin in Georgia and discussed the idea of purchasing the Steerhead Ranch.

Meanwhile, McKinley contacted Gregory for the first time after learning from a banker in New York City that Gregory was interested in buying Wyoming ranch property. From this contact with Gregory,

which apparently occurred in New York City, McKinley learned coincidentally that Martin was a mutual friend of theirs and that Martin also had discussed with Gregory the possibility of purchasing the Steerhead Ranch. McKinley has a residence in Connecticut as does Gregory. Martin, on the other hand, lives in Georgia. The plaintiff asserts that diversity of jurisdiction exists because he is a citizen of the state of Alabama.[1]

Gregory began negotiations to buy the Steerhead Ranch and in mid-October 1988 he received a proposed purchase contract from the broker of the ranch, Mr. Claire Robinson. The proposed purchase price was 1.5 million dollars. After reviewing the contract, Gregory made some changes and returned it to the seller's attorney in Boston, Massachusetts. When Gregory, however, called Robinson to confirm acceptance of the contract, he was informed a higher bid for the property had been submitted. He learned it had been submitted by McKinley for $1,530,000, who soon purchased the ranch for that price. The defendants assert they were forbidden to submit a higher bid, evidently because if they had purchased the ranch, Robinson, the broker, would have received a smaller commission in that he would have had to share it with another broker. Nothing in the record, however, indicates that the defendants were in fact barred from submitting another bid. It seems unimaginable that such a thing would occur in light of the duty a real estate broker owes to a seller.

The defendants now contend they and McKinley had formed a joint venture for the purpose of purchasing the Steerhead Ranch and that McKinley, as a joint venturer, owed a fiduciary duty to them, which he breached by purchasing the ranch in his "individual capacity." The case is now before the court on the defendants' motions to transfer the case to the United States District Court for the Northern District of Georgia and to stay this litigation pending arbitration. Shortly after the plaintiff filed

this action, Martin and Gregory filed a complaint against McKinley in the United States District Court for the Northern District of Georgia. In that complaint, they assert the same claims as in their counterclaim filed in this court.

### Transfer

■ The statute under which the defendants request a transfer provides as follows: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Notwithstanding whether a transfer is convenient for the parties and witnesses and in the interest of justice, a court may grant a change of venue to the United States District Court for the Northern District of Georgia only if the plaintiff's action might have been brought there in the first instance. *Hoffman v. Blaski*, 363 U.S. 335, 343, 342–43, 80 S.Ct. 1084, 1089, 1088–89, 4 L.Ed.2d 1254 (1960). As previously noted, this is a diversity action in which the plaintiff seeks to quiet title to Wyoming real estate pursuant to 28 U.S.C. § 1655 and Wyo.Stat. § 1–32–208 (1977). The federal statute asserted in the complaint (28 U.S.C. § 1655) gives a federal court *in personam* jurisdiction over all persons in actions to quiet title to real estate located in the state where the federal court sits. *Consolidated Interstate Callahan Mining Co. v. Callahan Mining Co.*, 228 F. 528, 530 (D.Id.1915). Actions brought under this statute, however, must be brought in the district where the property is located. *First Charter Land Corp. v. Fitzgerald*, 643 F.2d 1011, 1014 (4th Cir. 1981). Because the plaintiff seeks to quiet title to property located in this district, it is not an action that might have been brought in Georgia.

The defendants contend, however, that because they were not asserting a claim against a particular property until the plaintiff filed this action, the plaintiff

---

**1.** Although the plaintiff alleges he is a citizen of Alabama, an allegation admitted by the defendants, the court notes from an extensive review of the file in this matter, that all important communications between these parties including the most recent ones refer to McKinley's Connecticut address, not his Alabama home.

should have sought declaratory relief that no joint venture existed. The documents submitted by the parties, however, belie this assertion. The letters and documents exchanged between the parties plainly demonstrate the defendants were asserting claims to the Steerhead Ranch. In a February 28, 1989, letter to the plaintiff, Martin stated that he and Gregory would not permit the plaintiff to exclude them from the Steerhead Ranch. Additionally, in a March 3, 1989, letter from the plaintiff to Martin reference is made to the defendants assertion of a joint venture for the purpose of acquiring the ranch at issue.

The documents in the record further indicate that prior to this suit, the defendants disputed the plaintiff's right of ownership to the Steerhead Ranch. The parties considered arbitration to determine rightful ownership. One of the defendants' proposed arbitration drafts included the following: "A dispute has arisen between the claimants and the respondent relating to the ownership of a parcel of real estate located near Buffalo, Johnson County, Wyoming, and known as the Steerhead Ranch...." In the face of these claims, the plaintiff filed this lawsuit to quiet title to the property. In their counterclaim, the defendants assert a claim to the Steerhead Ranch based on an allegation that a joint venture existed under which they were to receive a share of the ranch. Such an allegation, if proved, "would clearly create an interest in the land," entitling them to ownership. *Shuford v. Anderson,* 352 F.2d 755, 760 (10th Cir.1965). The court finds this action was properly brought in this district and was one that could not have been brought in Georgia.

■ Assuming this action could have been brought in Georgia, the court finds a transfer would be unwarranted. A court should rarely disturb the plaintiff's choice of forum, "unless the balance is strongly in favor of the defendant." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). In deciding whether to transfer a case, the court must consider "the relative ease of access to sources of proof; availability of compulsory process for attendance of ... witnesses; possibility of view of premises ... and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.*

Important fact witnesses for the plaintiff, and perhaps for the defendants as well, will be Claire Robinson and the seller, Mrs. Kenney, both of whom are Wyoming residents. Should viewing of the property by the fact finder become appropriate, it will be easier for this court, as opposed to a Georgia court, to view the disputed property. Although access to other sources of proof may be just as easy elsewhere, the court finds after considering these factors, the balance tips in favor of the plaintiff.

Finally, in a diversity case, it is more appropriate to conduct the trial "in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself." *Gulf Oil,* 330 U.S. at 509, 67 S.Ct. at 848. In this diversity case, the plaintiff seeks to quiet title to Wyoming property and therefore, notwithstanding the defendants' assertions to the contrary, Wyoming law governs, a law with which this court is at home.

The defendants simply assert Georgia law controls because the parties allegedly formed a Georgia joint venture. The defendants however offer no evidence indicating the parties formed any joint venture whatsoever, much less a Georgia one.

On separate occasions, McKinley and Gregory visited Martin once or twice in Georgia on pleasure trips where they incidentally discussed the possible purchase of Wyoming property. Martin later had some telephone conversations from Georgia with McKinley and Gregory, who at those times were in New York, Connecticut, and possibly Wyoming. On the other hand, Gregory and McKinley had numerous conversations on the same subject while in New York and Connecticut. At no time did all three parties discuss simultaneously among themselves the purchase of Wyoming property. Gregory and McKinley, while on a golf outing in New York independently of Mar-

tin discussed for the first time the possibility of purchasing a Wyoming ranch. Not only is there a lack of evidence supporting the defendants' allegation of a Georgia joint venture, but more important, if a joint venture ever in fact existed, it could have equally been created by McKinley and Gregory either in New York or Connecticut. In other words, absent a written agreement, it makes no more sense to speak of a joint venture formed in Georgia than one formed in New York or Connecticut.

The joint venture allegation is an issue by virtue of the defendants' counterclaim. The decision to transfer is committed to this court's sound discretion. *Gulf Oil,* 330 U.S. at 506, 67 S.Ct. at 842. The defendants move this court to disturb the plaintiff's choice of forum based solely on their naked allegations the parties entered into a binding legal relationship in another forum. The court must deny the defendants' motion.

### Arbitration

The defendants have filed a motion to stay this litigation pending arbitration. The motion is filed pursuant to the Federal Arbitration Act, 9 U.S.C. § 3. The defendants have also filed an action in the United States District Court for the Northern District of Georgia wherein they seek an order compelling the plaintiff to submit this dispute to binding arbitration. According to the defendants, the plaintiff is required to arbitrate this dispute under an agreement created by an exchange of letters between Martin and McKinley. The plaintiff denies that the exchange of correspondence constitutes an agreement to arbitrate.

A dispute between the parties arose after McKinley purchased the Steerhead Ranch for himself. The defendants protested, asserting that the purchase was supposed to have been for the benefit of their alleged joint venture. In an effort to resolve the dispute, Martin sent a letter to McKinley suggesting resolution by arbitration. He stated in pertinent part as follows:

> There is an alternative solution to resolve this dispute without litigation. An arbitration procedure to which we would all agree; it would be binding upon us. I suggest that Grant and you will appoint an individual who will act as your appointed arbitrator. I am willing to agree to whomever Grant appoints. Those two individuals will then select a third arbitrator. They are to commence immediately, and conclude their investigation within sixty (60) days, at which time they will render their decision. It seems to me that this arbitration procedure would be a great deal less expensive (but not free) than litigation. They do it quickly and efficiently.

Letter from Justus C. Martin, Jr. to John K. McKinley (Feb. 27, 1989). Martin asked that McKinley select by March 3, 1989, one of three methods for resolution: compromise, arbitration, or litigation.

On March 3 McKinley wrote a letter to Martin, rejecting the compromise method. The letter, however, contained the following language, which defendants interpret as an offer:

> If you are unwilling to resolve the matter even on the auction basis, I would be willing to arbitrate the matter as a last resort. I believe arbitration is a slower, more expensive, more contentious way than the auction, but if that is what is needed, I would agree to it. It seems to me that the arbitrator should decide whether there was a legally enforceable joint venture among the three of us under the terms by which we would jointly purchase the property at an agreed price, and then whether the property would be divided so that I would have received less than 4,000 acres as you claim. If the arbitrator rules in your favor, I would convey all the property to the two of you for my purchase price and all out-of-pocket cost, expenses and interest. If the arbitrator rules in my favor, you would have no further claims or rights with respect to the property.

In response, Martin replied by letter to McKinley expressing rejection of his bidding procedure, but continued as follows:

> I have received your letter of March 3 and discussed it with Grant. For the

reasons which we have stated previously we are not agreeable to the bidding procedure which you have suggested. We are, however, agreeable to arbitrating this dispute in the shortest time frame possible. For that reason, we accept your offer and willingness to arbitrate.

Letter from Justus C. Martin, Jr. to John K. McKinley (Mar. 8, 1989). The letter then suggested the parties endeavor through their attorneys to draft a formal arbitration agreement providing that arbitration would be final and binding upon them and specifying the procedure to be followed. At that time, the plaintiff was represented by Andrew B. Kirkpatrick, Jr. Kirkpatrick sent a letter to the defendant's attorney Joseph R. Manning, informing him he had enclosed a draft agreement for his consideration. Letter from Andrew B. Kirkpatrick to Joseph R. Manning (Mar. 22, 1989) (discussing the parties endeavors to formulate the issues to be submitted to arbitration). The draft referred to the parties' dispute over the Steerhead Ranch and provided the arbitrators were to decide "in accord with legal principal" whether the parties had an enforceable agreement to jointly purchase the ranch. In an April 17, 1989, letter to Kirkpatrick, Manning responded, stating in relevant part as follows:

I am enclosing for your review two agreements which deal with the arbitration procedure as well as the disposition of the property in the event my clients prevail in the arbitration. The arbitration submission agreement differs substantially from the procedure you had suggested, however, it incorporates and follows the general outline suggested to Mr. McKinley in some earlier correspondence. The agreement incorporates substantially the provisions contained in your draft as to how the property will be dealt with following the arbitration.

One of the enclosed agreements specified the arbitration procedure, while the other described how the ranch property would be divided among the parties after the outcome of the arbitration. Manning's arbitration draft, however, differed significantly from Kirkpatrick's in one key aspect. After referring to the parties' dispute over the ownership of the Steerhead Ranch, the draft proposed that it be resolved "equitably and fairly." Absent from Manning's draft was the issue whether the parties had an enforceable agreement—joint venture—to jointly purchase the Steerhead Ranch, an issue that Kirkpatrick proposed be addressed and decided by the arbitrators "in accord with legal principle."

Kirkpatrick found Manning's draft unacceptable because it failed to include this issue for resolution. On May 22, 1989, Manning again wrote to Kirkpatrick to propose that the following issue be included for arbitration: "(1) Was there an agreement, express or implied, between Messrs. Gregory, Martin, and McKinley to identify, negotiate for and subsequently acquire for their joint use enjoyment of the ranch in the state of Wyoming?" On May 24, Kirkpatrick replied to the proposal by facsimile transmission, proposing for resolution the issue whether the parties had "an enforceable agreement, express or implied, whether by way of joint venture or otherwise ... to acquire the Steerhead Ranch...." This proposal was evidently unacceptable to the defendants' attorney, resulting in an impasse to further negotiations.

■ It is well-established that the duty to arbitrate is contractual so that a party cannot be compelled to arbitrate a dispute unless he has agreed to do so. *AT & T Technologies v. Communication Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). (Citing *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)) and *Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 1364–1365, 4 L.Ed.2d 1403 (1960). In construing an arbitration agreement covered by the Federal Arbitration Act, "as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues about arbitrability." *Mitsubishi Motors Corp. v. Solar Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985). The Federal Arbitration Act "overrule[d] the judiciary's longstanding refusal to en-

force agreements to arbitrate," *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 219–20, 105 S.Ct. 1238, 1241–42, 84 L.Ed.2d 158 (1985) and "predate[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the act," requiring that "questions of arbitrability ... be addressed with a healthy regard for the federal policy favoring arbitration...." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1983).

Section 2 of the Federal Arbitration Act provides that a written agreement to submit to arbitration an existing controversy arising out of a transaction involving commerce "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. Section 3 of the Act "requires the federal court in which suit has been brought 'upon any issue referable to arbitration under an agreement in writing for such arbitration' to stay the court action pending arbitration once it is satisfied that the issue is arbitrable under the agreement." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 399, 87 S.Ct. 1801, 1803, 18 L.Ed.2d 1270 (1967) (quoting 9 U.S.C. § 3). To prevail on their motion, the defendants must show there is a written agreement to arbitrate a dispute arising out of a transaction involving commerce and that the dispute is one referable to arbitration.

### Agreement in Writing

The defendants contend that McKinley's March 3 letter was an offer to arbitrate, which Martin accepted by his letter of March 8. "An offer is the manifestation of a willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24 (1981). In his letter of March 3, 1989, the plaintiff stated he would be willing to arbitrate, if the defendants were not agreeable to resolving their dispute on the "auction basis." The court finds that this letter manifested plaintiff's willingness to agree to enter into an arbitration agreement in the future. In his March 8 response to McKinley's letter,

Martin suggested that the parties endeavor through their attorneys to draft a written arbitration agreement that would specify, among other things, the procedure by which the parties would arbitrate. In attempting to arrive at an acceptable agreement, the parties could not agree on what issues would be arbitrated or whether they should be resolved legally or equitably.

The parties also differed on the number of arbitrators to be selected. For example, the defendants proposed that three arbitrators be appointed. Each side would choose one arbitrator while the third would be chosen by the two selected by the parties. In contrast, the plaintiff's draft proposed that only one arbitrator be chosen to resolve their dispute. Unlike the defendants' proposal, the plaintiff's failed to provide a method by which the parties would select the arbitrator.

A party's right to choose an arbitrator is, of course, an important one. *See, e.g., Lobo & Co. v. Plymouth Navigation Co. of Monrovia,* 187 F.Supp. 859, 860 (S.D.N.Y.1960) (arbitration selection process for arbitration panel should be such that it results in a mutually acceptable panel). Staying this litigation under the Federal Arbitration Act either would relegate this dispute to a state of perpetual uncertainty or would *force* the parties to draft a written arbitration agreement acceptable to both sides, a goal they so far have been unable to achieve. The purpose of the FAA is quick and inexpensive resolutions of controversies by arbitration where the parties clearly have agreed to do so. Staying this litigation pending "arbitration" would be contrary to the Act in that there has been no meeting of the minds as to an arbitration agreement. Not only have the parties failed to agree on the issues to be resolved, but moreover, they have failed to agree on the number and the selection process of the arbitrators. Although the parties agreed to draft a future arbitration agreement, the endeavor proved unsuccessful, mainly as a result of the defendants' unwillingness to accept the plaintiff's proposed issue for arbitration: "Was there a legally enforceable agreement for McKinley and [Defendants] to

acquire the Steerhead Ranch under terms whereby McKinley would acquire less than 4,000 acres of the Ranch." Instead, the defendants rejected the plaintiff's draft and "urg[ed] [him] to *agree to a form of arbitration agreement* that is neutral and preserves our relative legal positions." (Letter from Joseph R. Manning to Andrew B. Kirkpatrick, Jr. (May 22, 1989) (proposing issues for arbitration)). Although the plaintiff attempted to address the defendants' concerns, communications between the parties deteriorated, resulting in this lawsuit. In light of this history, the court finds it odd that the defendants are asserting there was an enforceable agreement to arbitrate.

In accordance with this opinion, IT IS HEREBY ORDERED that the defendants' motion to transfer this case to the United States District Court for the Northern District of Georgia be, and the same hereby is, DENIED. IT IS FURTHER ORDERED that the defendants' motion to stay this litigation pending arbitration be, and the same hereby is, DENIED.